Rosanne L. Mah (State Bar No. 242628)
Email: rmah@zlk.com
**LEVI & KORSINSKY, LLP**
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294

*Counsel for Plaintiffs*

[*Additional Counsel listed on signature block*]

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CRAIG CLEMENS, ANAN THAMARNAN, ALEC OTTO, KYLE PENN, JAMES SUPPLE, MICHAEL MIGIERO, PETER DEDES, JESSE CASE, RICHARD BARILLA, MICHAEL OLIVER, ROBERT IRELAND, EDWARD SEIMON, MATTHEW BATTISTINI, and KADEEM BLANCHARD, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>    v.<br><br>NANO F/K/A RAIBLOCKS F/K/A HIEUSYS, LLC; COLIN LEMAHIEU; MICA BUSCH; ZACK SHAPIRO; TROY RETZER; BG SERVICES, S.R.L. F/K/A BITGRAIL S.R.L. F/K/A WEBCOIN SOLUTIONS; AND FRANCESCO "THE BOMBER" FIRANO,<br><br>       Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

NATURE AND SUMMARY OF THE ACTION ....................................................... 2

JURISDICTION AND VENUE ................................................................................. 6

PARTIES...................................................................................................................... 7

CLASS ACTION ALLEGATIONS ........................................................................ 10

SUBSTANTIVE ALLEGATIONS ......................................................................... 14

    I.      Background on Blockchain Technology.......................................... 14

    II.     Creation of XRB ................................................................................ 15

    III.    XRB is Not Decentralized ............................................................... 16

    IV.    Cryptocurrency Faucets and the XRB Faucet................................ 18

    V.     The Nano Defendants' Efforts to List XRB on Established Exchanges........................ 22

    VI.    XRB is Listed on Exchanges and Bona Fide Offered to the Investing Public ............ 23

    VII.   The Nano Defendants and Firano Create and Launch BitGrail Together ................... 25

    VIII.  Defendants Heavily Solicit the Purchase of XRB on BitGrail ......................... 27

           A.     Instructing Members of the Investing Public to Purchase XRB ..................... 27

           B.     Encouraging the Public to Spread the Word..................................... 31

           C.     Increasing Social Media and Online Presence................................. 32

           D.     Downplaying Speculation: the "HODL Mentality"......................... 34

    IX.    The Nano Defendants Close the Nano Faucet and Extract Millions in Profits ............ 34

    X.     Defendants' Representations Regarding their Duties and Obligations to Investors..... 36

    XI.    Nano's Recommendations Fail to Disclose the XRB Protocol's and the BitGrail Exchange's Lack of Safeguards Protecting the Class' Deposits ................................. 38

           A.     The Trading Platform Problem ......................................................... 38

           B.     The Verification Problem .................................................................. 39

           C.     The $170 Million Disappearing XRB Problem ............................... 39

           D.     Lack of Idempotence in the Nano Protocol Resulted in the Theft of the Class' XRB Worth $170 Million ...............................40

i

E.     Defendants Breached Their Duties Owed the Class and Concealed the Theft of the Class' XRB Investments for Eight Months ................................................. 42

COUNT I ............................................................................................................................ 46

COUNT II ........................................................................................................................... 47

COUNT III .......................................................................................................................... 49

COUNT IV .......................................................................................................................... 50

# **INTRODUCTION**

Plaintiffs Craig Clemens, Anan Thamarnan, Alec Otto, Kyle Penn, James Supple, Michael Migiero, Peter Dedes, Jesse Case, Richard Barilla, Michael Oliver, Robert Ireland, Edward Seimon, Matthew Battistini, and Kadeem Blanchard (together, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Class Action Complaint (the "Complaint") claims against Defendants Nano f/k/a RaiBlocks f/k/a Hieusys, LLC ("Nano" or the "Company"), Colin LeMahieu ("LeMahieu"), Mica Busch ("Busch"), Zack Shapiro ("Shapiro"), Troy Retzer ("Retzer" and together with Nano, LeMahieu, Busch and Shapiro, the "Nano Defendants"), B.G. Services SRL f/k/a BitGrail SRL f/k/a Webcoin Solutions ("BitGrail"), and Francesco "The Bomber" Firano ("Firano" together with BitGrail, the "BitGrail Defendants") (collectively, "Defendants") for: (i) negligence; (ii) negligent misrepresentation; (iii) fraud; and (iv) breach of contract; seeking restitution based upon Plaintiffs' own knowledge and acts, and based on facts obtained upon investigation by their counsel, which include, *inter alia*: (a) documents and solicitation materials released by Defendants in connection with their promotion of a cryptocurrency called NANO (f/k/a RaiBlocks) ("XRB"); (b) public statements made by Defendants concerning XRB and its listing on BitGrail -- an Italian-based cryptocurrency exchange; (c) media publications concerning XRB and BitGrail; and (d) the bankruptcy decisions issued by the Tribunale Di Firenze of Italy against Defendant BitGrail in *In re BG Services (BitGrail S.R.L.)*, Trib. Florence, n.18/2019 (the "BitGrail Decision") and against Defendant Firano in *In re Firano*, Trib. Florence, n. 18/2019 (the "Firano Decision").

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

This Complaint is meant to be consolidated with the Amended Complaint filed in this forum in the class action lawsuit styled *Fabian v. Nano et. al.*, U.S. District Court - Northern District of California - Case No. 4:19-cv-00054-YGR (SK) (the "*Fabian* Action"); so Plaintiffs in this related action may be added as plaintiffs in the *Fabian* Action. This Complaint adds no material substance to

the Amended Complaint in the *Fabian* Action beyond merely naming new Plaintiffs and setting forth the facts underlying their claims.

## **NATURE AND SUMMARY OF THE ACTION**

1.      This is a class action on behalf of a class of investors consisting of all individuals and entities who are citizens of the United States and who -- from April 1, 2017 through March 31, 2018, inclusive -- transferred to BitGrail fiat currency or cryptocurrency to invest in XRB or transferred XRB to BitGrail and who suffered financial injury as a result thereof (the "Class" who purchased or held XRB on BitGrail during the "Class Period").   This action seeks to recover rescissory, compensatory, punitive and injunctive relief under various state and common law claims against Nano, certain of its top officials, certain influential promoters that received compensation in exchange for selling XRB or soliciting the general public to purchase XRB, and its partner the BitGrail Defendants.

2.      The Nano Defendants developed XRB, which they each promoted, offered, traded and sold to the general public for the Nano Defendants' personal financial benefit.

3.      XRB has never been registered as a security with the Securities and Exchange Commission and is not exempt from registration.

4.      The Nano Defendants began working with the BitGrail Defendants to create BitGrail's "RaiBlocks dedicated exchange" (the "BitGrail Exchange") in approximately December 2016.  Indeed, Defendant LeMahieu personally worked with Defendant Firano and a member of Nano's core development team—an individual known as "mikerow"[1]— until October 2017 in developing the BitGrail Exchange.   In the words of mikerow on an online cryptocurrency discussion forum (www.bitcointalk.org) on May 4, 2017, the BitGrail Exchange was "written from 0 for XRB."

5.      The BitGrail Exchange launched in April 2017 (www.bitgrail.com).  Throughout the Class Period, each of the Nano Defendants remained substantially involved in maintaining the BitGrail Exchange's XRB-related operations and retained significant control over Defendant Firano's decision making concerning the BitGrail Exchange.

---

[1] "Mikerow" left the Nano development team in late-2017 following a disagreement regarding the Nano Defendants' decision to cease the Nano Faucet (defined *infra*).

6.    Throughout the Class Period, the Nano Defendants directed the investing public to purchase XRB through, and stake XRB at, BitGrail by, *inter alia*: (i) commissioning, and contributing to, the creation of the BitGrail Exchange; (ii) providing specific investment instructions and assurances that the BitGrail Exchange was secure and could be trusted to safeguard investment assets; and (iii) collaborating with the BitGrail Defendants in maintaining the BitGrail Exchange on its XRB-related operations.

7.    In July 2017, during a private group chat between Defendant Firano and the Nano Defendants, Firano reported to the Nano team that there was an error in the code (the "XRB Protocol") for maintaining XRB's ledgers and transferring XRB from the BitGrail Exchange into private wallets, which caused certain transactions to be entered two or more times.[2]    The Double Withdrawal Transactions occurred because the XRB Protocol lacked "idempotence."[3]

8.    Due to the XRB Protocol lacking idempotence, the Double Withdrawal Transactions were accomplished even if the account transferring the XRB off of the BitGrail Exchange lacked sufficient funds to complete the multiple transactions—by transferring XRB belonging to other accountholders off of the BitGrail Exchange to the private wallet destination.

9.    Approximately 2.5 million XRB were stolen in July 2017 by exploiting XRB's lack of idempotence in the XRB Protocol, which permitted Double Withdrawal Transactions.

10.    The error permitting the Double Withdrawal Transactions was exploited by anonymous users of the BitGrail Exchange from July 2017 through and including January 2018 to ultimately obtain over 15 million XRB rightfully belonging to the Class.

---

[2] While these withdrawals involved two or more identical transactions being processed, these erroneous transactions are, for simplicity, referred to herein as "Double Withdrawals Transactions."

[3] As explained by the Tribunal in the BitGrail Decision: "'Idempotence' is the property of executing a command only once, even if issued multiple times, even if identical and in rapid succession. To give a 'trivial' but clarifying example: during cash withdrawals at an ATM, also trying to press the withdrawal button several times, the 'idempotent' function means that the device can emit one and only one withdrawal command, providing the requested cash only once, and tracking the withdrawal only once in the account statement of the customer."

11.    Throughout the BitGrail Exchange's existence, Defendant Firano "highly recommended to [the Nano Defendants] that we close the markets because of major issues with the NANO protocol, but they were hesitant and forced me to keep it open and sometimes begged as well."[4]

12.    On or about February 8, 2018, the BitGrail Defendants announced that over 15 million XRB, bearing a market value at the time of approximately $170 million, which were supposedly safely stored on BitGrail, were "lost."

13.    Less than 24 hours after investors learned that the entirety of their XRB holdings were "lost," the Nano Defendants released to their XRB investors an "Official Statement Regarding BitGrail Insolvency," denying any responsibility and pointing their finger at BitGrail:

> BitGrail is an independent business and Nano is not responsible for the way Firano or BitGrail conduct their business. We have no visibility into the BitGrail organization, nor do we have control over how they operate.

*See* Nano Core Team, *Official Statement Regarding BitGrail Insolvency* (Feb. 9, 2018).

14.    Since that announcement, the Nano Defendants have made every effort to distance themselves from BitGrail and their substantial involvement with BitGrail's operations related to purchasing, selling, and storing custody of XRB.

15.    Indeed, the Nano Defendants have even gone so far as to fund a lawsuit against its former partners, the BitGrail Defendants, to avoid unwanted attention for their actions.  For example, on April 6, 2018, a putative class action (which has since been settled on an individual non-public basis) was filed in the United States District Court for the Southern District of New York.  A mere three (3) days later, on April 9, 2018, the Nano Defendants announced that the Company was "sponsoring" a "legal fund" purportedly designed to "provide all victims of the hack of the cryptocurrency exchange BitGrail with equal access to representation" and enable such investors to seek recourse against the exchange.

---

[4] The foregoing is from a public statement Defendant Firano published on May 2, 2018 on Medium.com regarding his relationship with the Nano Defendants and BitGrail's operations.  This post was titled "On NANO and BitGrail and The Repercussions of Supporting Technology That Is Not Ready For Mass Consumption" and is referred to herein as the "Firano Statement."

16. On February 16, 2018 -- after the 15 million XRB had been "lost" -- the Nano Defendants updated the XRB Protocol to include idempotence, thereby preventing future Double Withdrawal Transactions from occurring.

17. Defendants: (a) successfully solicited the general public to entrust BitGrail with their substantial assets by promoting, encouraging, and otherwise directing investors to establish XRB trading accounts at BitGrail; (d) expressly endorsed and assured the public that BitGrail was a safe, secure, and valid exchange; (e) continued to endorse and promote the use of BitGrail as a safe, secure, and valid exchange, notwithstanding having direct insider information of specific issues likely to jeopardize accountholders XRB investments months prior to the February 8, 2018 announcement; and (f) profited from the purchase and sale of XRB on BitGrail and other exchanges.

18. Plaintiffs' claims for negligence against the Nano Defendants arise from the Nano Defendants' failure to adopt adequate idempotency measures in the XRB Protocol and the BitGrail Defendants' failure to safeguard the Class' XRB deposits, resulting in the theft of the Class' XRB— representing a $170 million loss.

19. Plaintiffs' claims for negligent misrepresentation arise from Defendants' assurances through January 2018 that the Class' XRB deposits on the BitGrail Exchange were "safe" despite having actual knowledge of, or recklessly disregarding, the fact that the Double Withdrawal Transactions were occurring as early as July 2017—when according to the Tribunal in the BitGrail Decision, Defendant Firano notified the Nano Defendants of the issue in a private group chat.

20. Plaintiffs' claims for fraud arise from Defendants' intentional concealment of the losses occurring on the BitGrail Exchange throughout the Class Period by falsely assuring that the Class' funds were safe. Plaintiff and the Class detrimentally relied on these false assurances by maintaining their XRB funds on the BitGrail Exchange rather than withdrawing the XRB to their personal wallets. Because the Nano Defendants created XRB and maintained the XRB Protocol and repeatedly vouched that the BitGrail Defendants could be trusted, Plaintiff's reliance on Defendants false assurances was justifiable. To the Class' detriment, Defendants each benefited from their concealment of the XRB

losses by the Nano Defendants' sale of millions of XRB at inflated prices and the BitGrail Defendants' ability to extract transaction fees operating the BitGrail Exchange.

21.     Plaintiff's claim for breach of contract against the BitGrail Defendants arises from "the agreement executed between the exchanger and its users [being] a service agreement through which the exchanger guarantees the possibility to perform the exchange, sale and purchase and deposit, through an account, of various types of virtual currencies, including the 'Nano' cryptocurrency." *See* BitGrail Decision.  The BitGrail Defendants breached this contract by failing to maintain the Class' XRB deposits on the BitGrail Exchange, as evidenced by the loss of $170 million worth of the Class' XRB investments announced in February 2018.

22.     Plaintiffs and the Class are among the members of the public who invested in tens of millions of dollars' worth of XRB to be held in, and exchanged from, their BitGrail accounts, and who, from April 2017 through March 2018, through no fault of their own, suffered a loss of more than $170 million worth of XRB when their investment holdings were simply "lost."

23.     For these reasons, Plaintiffs on behalf of themselves, and all similarly situated XRB investors, seeks compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments made to purchase, or store, XRB Tokens on BitGrail prior to February 8, 2018.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and 1332(d)(2)(A) because this is a class action in which the matter or controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs, and in which some members of the Class are citizens of a state different from Defendants.

25.     The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

**PARTIES**

**Plaintiffs**

27.     Plaintiff Craig Clemens is an individual domiciled Pacific Palisades, California, and is *sui juris*. On February 8, 2018, Plaintiff Clemens had 31372 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Three Hundred and Seventy Five Thousand Dollars ($375,000.00).

28.     Plaintiff Matthew Battistini is an individual domiciled Ellenton, Florida, and is *sui juris*. On February 8, 2018, Plaintiff Battistini had 330 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Four Thousand Dollars ($4,000.00).

29.     Plaintiff Kadeem Blanchard is an individual domiciled Tampa, Florida, and is *sui juris*. On February 8, 2018, Plaintiff Blanchard had 200 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Two Thousand Five Hundred Dollars ($2,500.00).

30.     Plaintiff Edward Seimon is an individual domiciled Chaska, Minnesota, and is *sui juris*. On February 8, 2018, Plaintiff Seimon had 800 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Nine Thousand Six Hundred Dollars ($9,600.00).

31.     Plaintiff Kyle Penn is an individual domiciled Los Angeles, Minnesota, and is *sui juris*. On February 8, 2018, Plaintiff Penn had 329.48 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Four Thousand Dollars ($4,000.00).

32.     Plaintiff Alec Otto is an individual domiciled North Hollywood, California, and is *sui juris*. On February 8, 2018, Plaintiff Otto had 391 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Four Thousand Five Hundred Dollars ($4,500.00).

33.     Plaintiff Robert Ireland an individual domiciled Port Washington, Wisconsin, and is *sui juris*. On February 8, 2018, Plaintiff Ireland had 74.25 XRB frozen by Defendants -- valued on or about February 8, 2018 at over One Thousand Dollars ($1,000).

34.     Plaintiff Michael Oliver is an individual domiciled Traverse City, Michigan, and is *sui juris*. On February 8, 2018, Plaintiff Oliver claims to have had an amount of XRB frozen by the Defendants, and incurred losses as a result.

35.     Plaintiff Richard Barilla is an individual domiciled Jersey City, New Jersey, and is *sui juris*. On February 8, 2018, Plaintiff Barilla had 4144 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Fifty Thousand Dollars and ($50,000.00).

36.     Plaintiff Jesse Case is an individual domiciled Chicago, Illinois, and is *sui juris*. On February 8, 2018, Plaintiff Case had 112.7 XRB frozen by Defendants -- valued on or about February 8, 2018 at over One Thousand Five Hundred Dollars ($1,500.00).

37.     Plaintiff Peter Dedes is an individual domiciled Chicago, Illinois, and is *sui juris*. On February 8, 2018, Plaintiff Dedes had 1800.67 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Twenty Two Thousand Dollars ($22,000.00).

38.     Plaintiff Anan Thamarnan is an individual domiciled Rowland Heights, California, and is *sui juris*. On February 8, 2018, Plaintiff Thamarnan had 674.06 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Eight Thousand Dollars ($8,000.00).

39.     Plaintiff James Supple is an individual domiciled Rockville Centre, New York, and is *sui juris*. On February 8, 2018, Plaintiff Supple had 2570.50 XRB frozen by Defendants -- valued on or about February 8, 2018 at over Thirty One Thousand Dollars ($31,000.00).

40.     Plaintiff Michael Migliero is an individual domiciled Austin, Texas, and is *sui juris*. On February 8, 2018, Plaintiff Migliero had 17000 XRB frozen by Defendants -- valued on or about February 8, 2018 at over TTwo Hundred and Five Thousand Dollars ($205,000.00).

**Defendants**

41.     Defendant Nano f/k/a RaiBlocks f/k/a Hieusys, LLC ("NANO") is a Texas company which lists its principal place of business in Austin, Texas.  According to NANO's own published

8

promotional materials, NANO is a "low-latency payment platform" that "utilizes a novel block-lattice architecture" on which "each account has [its] own blockchain as part of a larger directed acyclic graph." In layman's terms, NANO purports to have created a faster, cheaper, and more scalable blockchain and cryptocurrency that improves upon earlier blockchains and cryptocurrencies such as the widely-popular bitcoin.

42. Defendant Colin LeMahieu ("LeMahieu") is an individual domiciled in Austin, Texas and is *sui juris*. According to Nano's own published promotional materials, LeMahieu founded NANO in 2014 and serves as the Company's Lead Developer, "spearheading development of the core protocol."

43. Defendant Mica Busch ("Busch") is an individual domiciled in Chicago, Illinois and is *sui juris*. According to NANO's own published promotional materials, at all relevant times, Busch was a key member of Nano's core team, serving as a "Control System Developer" for Nano's "Residential" and "Enterprise" markets.

44. Defendant Zack Shapiro ("Shapiro") is an individual domiciled in Brooklyn, New York and is *sui juris*. According to Nano's own published promotional materials, at all relevant times, Shapiro was a key member of Nano's core team, as he "runs Mobile, Wallets, and Product" for the company and served as the company's head iOS Developer.

45. Defendant Troy Retzer ("Retzer") is an individual domiciled in Hilton Head Island, South Carolina and is *sui juris*. According to Nano's own published promotional materials, Retzer is a key member of Nano's core team, as he manages and directs the company's marketing and Community and Public Relations efforts.

46. Defendant B.G. Services SRL f/k/a BitGrail SRL f/k/a Webcoin Solutions ("BitGrail") was a cryptocurrency exchange operating in Italy which was primarily focused on creating and sustaining a market for XRB/Nano. In July 2018, an Italian Court of Appeals ordered BitGrail's assets to be frozen with the anticipation that the minimal funds remaining will eventually be used to refund investors such as Plaintiffs.

47.     Defendant Francesco "The Bomber" Firano ("Firano") is an individual believed to be domiciled in Italy and the sole proprietor of BitGrail.  Firano has consistently blamed the Nano Defendants for the "loss"/theft of the putative class's funds from BitGrail.

48.     In addition to those persons and entities set forth as Defendants herein, there are likely other parties who may well be liable to Plaintiffs and the Class but respecting whom Plaintiffs currently lack specific facts to permit them to name such person or persons as a party defendant.  By not naming such persons or entities at this time, Plaintiffs are not waiving their right to amend this pleading to add such parties, should the facts warrant the addition of such parties.

## <u>CLASS ACTION ALLEGATIONS</u>

49.     A class action is the proper form to bring Plaintiffs' and the Class' claims under Rule 23 of the Federal Rules of Civil Procedure.  The proposed class is so large that joinder of all members would be impractical.  Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

50.     Plaintiffs bring this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all members of the following class:

> **All BitGrail investors and accountholders who are citizens of the United States and who, between April 1, 2017 and March 31, 2018, and who transferred bitcoins, alternative cryptocurrencies, or any other form of monies or currency to BitGrail to purchase, invest in, or stake XRB.    Excluded from the class are: Defendants themselves, Defendants' retail employees, Defendants' corporate officers, members of Defendants' boards of directors, Defendants' senior executives, Defendants' affiliates, and any and all judicial officers (and their staff) assigned to hear or adjudicate any aspect of this litigation.**

51.     This action satisfies all of the requirements of Federal Rules of Civil Procedure, including numerosity, commonality, predominance, typicality, adequacy, and superiority.

52.     Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical.

53. While the exact number of class members remains unknown at this time, upon information and belief, there are at least hundreds if not thousands of putative Class members.

54. Again, while the exact number is not known at this time, it is easily and generally ascertainable by appropriate discovery.

55. It is impractical for each class member to bring suit individually.

56. Plaintiffs do not anticipate any difficulties in managing this action as a class action.

57. There are many common questions of law and fact involving and affecting the parties to be represented.

58. When determining whether common questions predominate, courts focus on the issue of liability; and if the issue of liability is common to the class and can be determined on a class-wide basis, as in the instant matter, common questions will be held to predominate over individual questions

59. Common questions include, but are not limited to, the following:

(i) whether the XRB offered for sale by Defendants constitute securities under federal securities laws;

(ii) whether Defendants violated federal securities laws in offering, selling, or soliciting the offer and sale of, unregistered securities—in the form of XRB;

(iii) whether by virtue of Defendants' custodianship over the proposed class' investments or by their control over the Nano Protocol, Defendants owed a fiduciary duty to Plaintiffs and the proposed class and if so, whether that duty was breached;

(iv) whether Defendants promoted XRB and BitGrail despite being aware of the exchange's shortcomings;

(v) whether Defendants are liable for steering Plaintiffs and the Class to BitGrail;

(vi) whether Defendants are liable for negligently auditing, vetting and/or supervising BitGrail;

(vii) whether statements made by Defendants about BitGrail were false or were made without due regard for the safety of those who read or heard the statements;

(viii)    whether Defendants benefitted from the Class purchasing and holding of XRB;

(ix)     whether Defendants capitalized on their XRB holdings at the expense of the Class;

(x)      whether Defendants have converted the funds belonging to Plaintiffs and the Class;

(xi)     whether Defendants owed duties to Plaintiffs and the Class, and whether Defendants breached those duties;

(xii)    whether Defendants' conduct was unfair or unlawful;

(xiii)   whether Defendants owe restitution to Plaintiffs and the Class;

(xiv)    whether Plaintiffs and the Class have sustained damages as a result of Defendants' conduct; and

(xv)     whether Defendants have within their power the ability to, and should, institute an equitable remedy that would resolve the harm that has befallen Plaintiffs and the Class.

60.     These common questions of law or fact predominate over any questions affecting only individual members of the Class.

61.     Plaintiffs' claims are typical of those of the other Class members because, *inter alia*, all members of the Class were injured through the common misconduct described above and were subject to Defendants' unfair and unlawful conduct.

62.     Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class.

63.     Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.

64.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in complex consumer class action litigation of this nature, to represent them.  Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class.

65. The infringement of the rights and the damages Plaintiffs have suffered are typical of other Class members.

66. To prosecute this case, Plaintiffs have retained counsel experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

67. Class action litigation is an appropriate method for fair and efficient adjudication of the claims involved herein. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; as it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.

68. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against well-funded corporate defendants like Nano.

69. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical. The nature of this action and the nature of laws available to Plaintiffs make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because: Defendants would necessarily gain an unconscionable advantage if they were allowed to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged; individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation; the Class is geographically dispersed all over the world, thus rendering it inconvenient and an extreme hardship to effectuate joinder of their individual claims into one lawsuit; there are no known Class members who are interested in individually controlling the prosecution of separate actions; and the

interests of justice will be well served by resolving the common disputes of potential Class members in one forum.

70.    Plaintiffs reserve the right to modify or amend the definition of the proposed class and to modify, amend, or create proposed subclasses before the Court determines whether certification is appropriate and as the parties engage in discovery.

71.    The class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

72.    Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

73.    As a result of the foregoing, Plaintiffs and the Class have been damaged in an amount that will be proven at trial.

74.    Plaintiffs have duly performed all of their duties and obligations, and any conditions precedent to Plaintiffs bringing this action have occurred, have been performed, or else have been excused or waived.

## **SUBSTANTIVE ALLEGATIONS**

### **I.    Background on Blockchain Technology**

75.    A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves, and presents information. The general idea is that each "block" contains information, such as details on transactions that are made. After a "block" is created (with cryptography so as to verify its contents), the information inside of it cannot be changed. The "block" then becomes part of the "blockchain" and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain. After this process is complete, another block is created with additional information and so on and so forth.

76.    To date, most "blockchains" are used to record transactions involving virtual currencies, *e.g.*, bitcoin. However, a "blockchain" could be used to record all types of information. For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

**II.**     **Creation of XRB**

77.     XRB was originally launched in or about December 2014 under the brand name RaiBlocks.  XRB was initially represented by the stock ticker "MRAI." In mid-2016, the RaiBlock's stock ticker symbol was changed to XRB.  In January 2018, shortly before the "hack" was announced, the Nano Defendants rebranded RaiBlocks once again as "Nano."

78.     As early as February 2016, if not earlier, Defendant LeMahieu promoted XRB on online fora, as a free way to transact and settle micropayments:



79.     The promotion of XRB ramped up in and after March 2016, including promoting XRB on various online social networks, such as Reddit and Twitter.

80.     Around this time, Defendants planned, formulated, and began executing a marketing campaign designed to develop popular interest in and mass adoption of XRB.

81.     For example, in a March 3, 2016 Reddit post, Defendant LeMahieu advertised XRB's competitive edge as its unique capacity to eliminate confirmation delays and fees: "RaiBlocks

[XRB/Nano] places transactions in to ledger on an individual basis.  This removes the concept of block intervals, block sizes, and all the other complicated paramtes that destroy scalabity."



## III.    XRB is Not Decentralized

82.    XRB is not a decentralized cryptocurrency.

83.    The Nano Defendants have made multiple representations to imply that they are merely part of a larger network that has collectively developed and maintained a decentralized protocol.  Such representations from the Nano Defendants are demonstrably false.  Investors in XRB rely almost exclusively on the efforts of the Nano Defendants and their core team.[5]

84.    To illustrate, on or about September 10, 2018, Reddit user DeepBlueMachine presented the following questions and concerns to the Nano Team concerning its apparent centralized nature:

1.    NANO centralization concerns, where 70-80% NANO are centralized even currently.

2.    90% of github commits by one person working on the team Colin.
. . .

3.    Whales initially might have hired third-world country folks to solve captcha and gain control of Nano. Currently 100 addresses hold 65% of all 133 million NANO which is kind of crazy.

85.    In response, Defendant Retzer acknowledged that Nano is centralized, that Defendant LeMahieu is responsible for developing at least 90 percent of all of Nano's underlying coding and programing, and that just 100 unique accounts own and hold at least 65 percent of the existing XRB:

---

[5]    *See* https://www.nano.org/en/team/ (last visited Oct. 8, 2018).

1.  **Nano has been steadily moving towards decentralization this year without really any active programs pushing it.** As it becomes more of a focus I expect this trend to continue.

2.  **Colin was the lone dev for a few years, so if you look at total commits then yea, he is going to have the majority of them.** He also has not led the last 2 releases.

     . . .

3.  **The did hire people to solve the captcha. Anyone was able to do this.** People buy more bitcoin miners in order to have more bitcoin.

(Emphasis added).

86.   Moreover, the Nano Core Team possesses more than 50 percent of the total voting power. In addition to the Nano Core Team, a total of nine other representatives comprise the ownership of over 96 percent of the total voting power.

87.   The Nano Core Team handles all aspects of business development and marketing. As Defendant LeMahieu wrote in January 2018 on Reddit, it is merely wishful thinking that non-Nano Core Team members will contribute to Nano's development, and the Nano Core Team will not wait for those contributions to materialize:

> Right now we have about 12 people, half core and half business developers. I think this count is good for working on what we're doing right now which is getting wallets and exchanges worked on. **Ideally people outside our team will start developing technology around xrb taking advantage of the network effect to build more technology faster than we could internally. That being said we're going to look in a few months to see if there's anything out there people aren't developing that should be and we'll see what people we need to make it happen.**

(Emphasis added).

88.   While the Nano Defendants might claim it is working towards the goal being a decentralized, that goal has yet to be achieved. As Defendant LeMahieu acknowledged in a post contrasting Nano from Ripple on Reddit on September 27, 2018, Nano is not yet decentralized (rather, that is the goal the Nano Core Team is working toward), the Nano Defendants make the important decisions, and the Nano Defendants implement those important decisions: "Nano [XRB] is 100% **aiming** for decentralized interbank settlement though our approach is compared to [Ripple]. **We're**

plugging in to the existing FX trading economy with a currency that has instant settlement. . . **We're taking incremental steps which will be far, far easier for FX to adopt instead of trying to boil the oceans from the start.**" (Emphasis added).

89.     Stated otherwise, the Nano Defendants wield absolute control over essentially every aspect of XRB; and its value—and continued existence—is based entirely on their actions or inactions. This significant control creates a special relationship giving rise to a fiduciary duty that the Nano Defendants owed investors such as Plaintiffs and the proposed Class.

**IV.    Cryptocurrency Faucets and the XRB Faucet**

90.     To incentivize the adoption and use of XRB, Defendants focused on distributing XRB to as many people as possible.  Rather than sell XRB for a price per coin, Defendants used a method of distribution known as a "faucet."

91.     It is critical to keep in mind that developers utilize faucets to generate public use, adoption and interest.  By giving away cryptocurrency for free, individuals can amass cryptocurrency without spending any money on purchasing the cryptocurrency.  Individuals who collect cryptocurrencies have a vested interest in their development, use, and mass adoption.  Consequently, faucets provide a way to build and grow a community of people who are interested in increasing the value of that particular cryptocurrency.

92.     To collect cryptocurrency from a faucet, an individual takes the following steps: (1) visit a website featuring the subject faucet; (2) type in the wallet address where the individual wants the cryptocurrency delivered; (3) click on a captcha (e.g., clicking an "I am not a robot" box); and (4) wait for a period of time before repeating the process (e.g., 10 minutes, 1 hour, etc.).

93.     Below is an example of a faucet distributing XRB:

94.     Once an individual completes this simple process, the faucet then distributes a (small) percentage of the total amount of cryptocurrency dedicated to the faucet.  For example, a developer team might assign 10 million of its coins to a faucet, and then permit 100 individuals per hour to collect .01 percent of that allocated sum from the faucet.  In practice, this means that the first 100 people to go to the faucet's website, type in their wallet address, and click on the captcha, will collect 1,000 coins per hour.

95.     Beginning in early 2016, the Nano Defendants opened a faucet for distributing XRB (hereafter, the "Nano Faucet").  The Nano Faucet operated for approximately one-and-a-half years before closing on or about October 15, 2017. The Nano Defendants regularly advertised and promoted the Nano Faucet on social networks, such as Defendant LeMahieu's March 4, 2016 post on Reddit's Cryptocurrency subreddit, with 900,000 members:



96.     The Nano Defendants had exclusive control and authority over every aspect of the Nano Faucet, including how much XRB it distributed (*e.g.*, 100 XRB per click), to how many people the distributions were made (e.g., the first 100 people), and the frequency of these distributions.

97.     For example, on March 7, 2016, Defendant LeMahieu wrote: "We're currently at 1.5% publicly distributed," meaning, the Nano Defendants had distributed 1.5 percent of the total supply of XRB via the faucet.  Defendant LeMahieu continued, providing a link to the "distribution schedule" design by the Nano Defendants.



98.     On April 3, 2016, Defendant LeMahieu further demonstrated his control over the Nano Faucet: "The short of the story is I think we have a way to make the faucet work and scale.  We'll total up faucet clicks and pay them out in bulk daily or hourly rather than instantly."



99.     The Nano Faucet was an undeniable success. Defendants assigned the then-total-existing supply of XRB to the faucet. They permitted between 100 and 150 individuals to claim approximately 1,000 XRB per hour throughout that time period. By October 2017, individuals across the world had claimed more than 120 million XRB, or approximately 40 percent of the then-existing total supply of XRB.

100.    In fact, the Nano Defendants acknowledged that many individuals devoted themselves to collecting XRB full-time, like a job:



101.    Similarly, Defendant LeMahieu recognized on September 18, 2017 that many "people who use xrb's faucet specifically for hours a day [do so] as their entire job . . .



## V. The Nano Defendants' Efforts to List XRB on Established Exchanges

102.    The Nano Defendants repeatedly represented to the public that they sought to list XRB on as many exchanges as possible to promote the purchase and adoption of XRB.

103.    On March 4, 2016, Defendant LeMahieu wrote on the Cryptocurrency subreddit – which had over 900,000 members – that XRB would be "getting listed" on two popular cryptocurrency exchanges in America and Russia – Bittrex (www.bittrex.com) and YoBit (www.yobit.net):



104.    In other words, Defendant LeMahieu implied that XRB had an international following and demand, and that XRB would soon appreciate in value and grow in adoption by listing it on online exchanges.

105.    On March 19, 2016, Defendant LeMahieu advised that XRB/Nano began marketing to the public in March 2016, which would address the lack of stability in XRB's price: "Part of the reason we've been out so long and haven't received much attention is we haven't been marketing until just

22

about the beginning of March. We've been working on stability and the ad clearing demo, at this point we think those two goals are achieved so we're hitting the pavement."

106. Defendant LeMahieu continued, encouraging mass promotion of XRB: "As always having XRB(RaiBlacks) [NANO] will only be useful if more people want to use it so getting the word out, telling anyone you find about the faucet and to try it out is what will ultimately make it useful."

107. Similarly, on April 21, 2016, Defendant LeMahieu submitted a post on the Bitcointalk forum complaining about the Nano Defendants' inability to get XRB listed on an exchange: "I've talked with Bittrex, Poloniex, C-Cex, many, many others over a period of almost 9 months trying to get accepted. I doubt many more are irritated at the situation than I am, if "any" of them would contact me back I'd be helping them get it listed."



## VI.    XRB is Listed on Exchanges and Bona Fide Offered to the Investing Public

108. Due to the fact that larger exchanges were unwilling to list XRB, the Nano Defendants decided in late-2017 to simply create a new exchange that would be built from the ground up and dedicated to XRB. Accordingly, in approxiamtely December 2016, the Nano Defendants approached Defendant Firano to create a "RaiBlocks dedicated exchange."

109.    Shortly thereafter, one of the numerous exchanges with which the Nano Defendants pleaded to list XRB agreed to list the asset.

110.    On March 4, 2017, XRB's first listing was obtained on an obscure exchange named Cryptopia—a New Zealand-based cryptocurrency exchange that has since gone into liquidation.

111.    Within weeks, on March 24, 2017, Cryptopia announced that it would be delisting XRB from its platform because of "excessive load from recaptcha click farmers, death threats to support, account abuse, deposit spamming and network syncing issues."

112.    The Cryptopia delisting pressured the Nano Defendants to secure XRB's listing on another exchange—regardless of its reputation—leading to XRB being listed on or about March 25, 2017 on a recently created and highly unreliable exchange—Mercatox.

113.    XRB's Mercatox listing immediately resulted in frustrations for the potential XRB investors attempting to purchase XRB through Mercatox. For example, on May 4, 2017, a user on the Bitcointalk forum posted:



114.    In early-April 2017, the Nano Defendants were anxious to create and sustain a market for XRB so they could profit by: (a) turning off the Nano Faucet, thereby significantly reducing XRB's supply and consequently increasing XRB's trading price, and then (b) selling their own XRB holdings at a significant premium.

115.    Given that Mercatox was highly unreliable and frequently did not process transactions, the Nano Defendants devoted a substantial amount of their effort to working with Defendant Firano on creating and launching BitGrail as quickly as possible.

## VII.   The Nano Defendants and Firano Create and Launch BitGrail Together

116.   The Nano Defendants began working with Defendant Firano to create BitGrail's "RaiBlocks dedicated exchange" *i.e.*, the BitGrail Exchange in approximately December 2016.

*117.*   Indeed, Defendant LeMahieu personally worked with Defendant Firano as well as multiple former members of XRB's then-"core" development team to create and launch the BitGrail Exchange.  In the words of a former XRB developer, the BitGrail Exchange was "written from 0 for XRB."  Similarly, in Defendant Firano's own words:

> *I was reached by [sic] the NANO team members to create a new exchange from the ground up that supported NANO natively, with the help of the coin designer Colin LeMahieu and the team that he had at the time.*

> *When BitGrail was being developed, we used the protocol that they recommended and designed and **we worked hand in hand in developing the NANO portion of the exchange.  The node implementation and API were all directed to us to be used by their team**.*

> *We spoke with their team almost on a daily basis and they recommended us how to run the NANO portion of the exchange.*

Firano Statement (Emphasis added).

118.   The BitGrail Exchange launched in April 2017 (www.bitgrail.com).

119.   BitGrail was far-and-away XRB's largest marketplace -- a result of strategic positioning and widespread marketing efforts by Defendants.



3      120.   Throughout the Class Period, each of the Nano Defendants remained substantially

4 involved in maintaining the BitGrail Exchange's XRB-related operations and retained significant

5 control over Defendant Firano's decision making concerning the BitGrail Exchange.

6      *121.*   As explained by Defendant Firano:

7
8      *I started implementing the NANO team's recommended API as well as their implementation of the nodes.*

9
10
11      *We consistently kept in touch and I was always transparent with them about the many issues, but **the NANO team had been hesitant in allowing me to shut down the NANO portion of the website** because it was causing major strain on our staff and hundreds to thousands of tickets and missed transactions that were consistently stuck in transfer with this coin.*

12                         \*\*\*

13
14
15      *As we continued to work with the NANO team consistently, the majority of the time **I highly recommended to them that we close the markets because of major issues with the NANO protocol**, but they were hesitant and **forced me to keep it open and sometimes begged as well**.*

16
17
18
19      *To mention again, the NANO team, especially Colin LeMahieu, had complete access to our servers for a while as we gave him direct access to the database and servers. That is how close **we worked as a team and as a preferred exchange which they forced me to keep open, despite my constant warnings about the technology and problems we were having for months**.*

20
21
22
23
24      *I had presented many issues to the team regarding the NANO technology and they continued to recommend to us on what to fix and to make it keep going, since the other exchanges also had constant issues with the same technology. We kept the markets open, despite constant node crashes, constant support tickets and angry customers that our team had to deal with due to the NANO node sync issues that are inherent in the technology itself, which had nothing to do with BitGrail services.*

25
26
27      *Despite the negativity towards BitGrail and myself on social media from disillusioned customers, I consistently recommended to the NANO developer team that this technology has major issues and we were having issues all the time with angry customers . . . I continually informed them of major issues with their technology and their implementation*

28

Firano Statement (Emphasis added).

Defendant Firano's description of events is also well-documented by the Nano Defendants' public statements throughout the Class Period. For example, on January 2, 2018, the Nano Defendants posted that Defendant Busch and Firano were "[t]wo passionate & hard-working gents" that were "solving the operational challenges at @BitGrail in a high-pressure environment as a game-changing tech matures."



## VIII. Defendants Heavily Solicit the Purchase of XRB on BitGrail

### A. Instructing Members of the Investing Public to Purchase XRB

122. The Nano Defendants promoted XRB as having the following relative advantages over other cryptocurrencies: transactions in XRB are purportedly instant, carry no fees, and have no limit to their scalability. By comparison to payments via credit or debit card, XRB purports to offer nearly instantaneous settlement of transactions with no transaction fees.

123. The Nano Defendants focused on promoting and encouraging individuals to purchase, sell, and trade XRB on online exchanges, and in particular, on BitGrail. Although the termination of the Nano Faucet briefly doubled the price of XRB to nearly seventeen cents ($0.17), it was trading on the BitGrail Exchange that drove the price of XRB up to nearly Twelve Dollars ($12.00) as of the February 8, 2018 loss.

124. On April 20, 2017, the official XRB/Nano account announced that XRB was available for purchase on their recently created BitGrail Exchange:



125. Similarly, Defendants released the following infographic on how to purchase XRB describing in detail how to purchase XRB from BitGrail:



126.     Indeed, the Nano Defendants recommended BitGrail on XRB/Nano's Twitter feed, on Reddit, on Slack, on Telegram, on Medium, and on its official website multiple times:



127.     As discussed in greater detail below, before the loss of 15 million XRB, the Nano Defendants expressly encouraged members of the public, including Plaintiffs and the Class, to purchase, trade, and hold XRB on BitGrail.

128.     Additionally, the Nano Defendants offered investment advice to XRB holders.  For example, Defendant Shapiro advised one XRB holder on Twitter: "I recommend selling your xrb there and withdrawing btc even if it's at a loss. Thanks":



129.     Similarly, Defendant Shapiro touted: "the faster $xrb can get in blockfolio,[6] the faster people can see their gains and losses and come to Bitgrail to invest more in a coin getting more and more attention."



130.     Indeed, Defendants even promoted XRB's coverage on investment shows such as CNBC's Fast Money:



---

[6] Blockfolio is a service that tracks cryptocurrency prices.

131.   Defendant Shapiro went so far as to create an application specifically designed to monitor XRB's price:



**B.      Encouraging the Public to Spread the Word**

132.   The Nano Defendants promoted XRB by instructing members of the public, including Plaintiffs and the Class, to tell their friends, family, and acquaintances to purchase and acquire XRB.

133. For example, on December 20, 2017, Defendant LeMahieu wrote: "I think the best thing an average fan could do is word of mouth and telling people about RaiBlocks [XRB]. More people being aware of it means there's the possibility someone who's never heard of it before would be interested in contributing as a vendor, developer, exchange, etc. Good advertising or marketing will never be able to reach everyone as well as someone reaching out within their own network."



134. In other words, the Nano Defendants encouraged and caused members of the public, including Plaintiffs and the Class, to lend their reputations, trust, and goodwill on their fellow friends, family, and followers to influence and cause more members of the public to purchase and acquire CRB.

**C. Increasing Social Media and Online Presence**

135. The Nano Defendants promoted XRB on various social-network platforms, including Reddit and Twitter, among others.

136.     For example, in September 2017, Defendant LeMahieu stated on Reddit's Cryptocurrency subreddit that XRB had "been organically growing and expanding since our launch two years ago and we want to open up discussion of the technology to a broader audience."



137.     The Nano Defendants also produced, participated in, and published videos online for members of the public, including Plaintiffs and the Class, to watch, which were used to promote the purchase, acquisition, and appreciation of XRB's value.

138.     The Nano Defendants also maintained numerous online group chats for members of the public, including the Class, to join, follow, and even contribute to on multiple fora.   For example, the Nano Defendants maintained an online group chats on Slack (https://slack.raiblocks.net), Telegram (www.telegram.com) and Discord (www.discord.com).   Therein, members of the public, including the Class, followed and engaged in ongoing conversations relating to XRB, such as price volatility, trading on BitGrail and other exchanges, price appreciation, and other related topics.

139.     In late 2017, the Nano Defendants revamped their website and grew their team to portray themselves in a more favorable light.   On December 20, 2017, Defendant LeMahieu wrote: "We have about 12 people in the core team; about half are code and half are business developers.   On the redesigned website we're going to include bios for sure . . . ."

Wed Dec 20 2017 13:21:27 GMT-0500 (Eastern Standard Time)

meor **Colin Lemahieu** 71 points · 1 year ago

We have about 12 people in the core team; about half are code and half are business developers. On the redesigned website we're going to include bios for sure, no one in our team is anonymous. I think we have pretty good coverage of what we need right now, we could always use more people capable of contributing to the core code.

The website design is well underway, we wanted to streamline and add some more things to it so it took longer than originally estimated. It'l looking like after the new year we'll have it ready.

Give Award   Share   Report   Save

### D. **Downplaying Speculation: the "HODL Mentality"**

140. The Nano Defendants were aware that members of the public, including Plaintiffs and the Class, were purchasing and acquiring XRB to "hodl," the jargon for patiently holding a cryptocurrency to wait for it appreciate in value before selling it.

141. Notwithstanding their awareness of this behavior by members of the public, including Plaintiffs and the Class, the Nano Defendants downplayed the significance of this speculative behavior as a bug and not a feature, when in fact, the opposite was true: speculation over XRB's price was the feature and the promise of future, mass adoption was the bug.

142. Defendants repeatedly acknowledged the speculative nature of XRB. For example, when a Reddit user suggested that Nano peg XRB to another nomination of value (*e.g.*, the U.S. Dollar) to stabilize the valuation, Defendant Retzer replied: "It is only stable to another currency. If the pegged currency fails, so does the stable coin. **We are still in the highly speculative stage of cryptocurrencies.** As time goes on and projects gain adoption and success, the volitality [sic] will decrease." (Emphasis added).

### IX. **The Nano Defendants Close the Nano Faucet and Extract Millions in Profits**

143. By October 2017, XRB's trading volume on BitGrail was significant and the Nano Defendants determined it was time to close the Nano Faucet and obtain millions of profits in the the process.

144. The Nano Faucet was shut down on October 15, 2017. Contemporaneous with the termination of the Nano Faucet, the Nano Defendants: (a) withheld seven million XRB for themselves for their work in conceiving, developing, promoting, and selling XRB to the public; and (b) "burned"

(meaning, purportedly sent to three digitals wallets that are inaccessible) the undistributed 60 percent of XRB that was not claimed during the Nano Faucet. In other words, the Nano Defendants condensed the entire value of XRB supply into the remaining 40 percent:



145.    Consistent therewith, the price of XRB nearly doubled at that time, from $0.09 per XRB to nearly $0.17 per XRB:



146.    As Defendant Busch acknowledged, during the Nano Faucet, the constant distribution of XRB to the public diluted the value of his shares, but the Nano Defendants' strategy of patiently waiting to grow a robust and interested network of holders resulted in substantial price appreciation:



147.    In addition, Defendant Busch wrote that the termination of the Nano Faucet eased "sell pressure."  In other words, the end of the Nano Faucet meant that individuals who acquired XRB by purchasing it with fiat or cryptocurrency translated into in holders of XRB who were less interested in quickly selling their holdings:



148.    In sum, Defendants stood to reap enormous returns by virtue of a robust and widespread network of individuals buying, selling, and trading XRB.

149.    The Nano Faucet served as the tool by which the Nano Defendants created and grew a public network of individuals invested in the development, adoption, and sustained growth of XRB.

**X.      Defendants' Representations Regarding their Duties and Obligations to Investors**

150.    At all times material, the Nano Defendants made various statements and representations that the Nano Defendants owed various duties of care and loyalty to Plaintiffs and the Class at large.

151.    For example, on March 7, 2016, Defendant LeMahieu wrote: "We're investigating creating an irrevocable legal trust to document our commitment to the distribution."

152.    On September 18, 2017, Defendant LeMahieu expressly recognized that the Nano Defendants' behavior, actions, and conduct was informed by their recognition of a correlation between listing XRB on larger exchanges and ensuing damages: "For a long time we weren't actively seeking because we wanted to hammer out node performance and usability issues. **Larger exchanges mean more visibility and damage if there had been problems**."



153.    On December 18, 2017, a person posted on RaiBlocks' subreddit: "Colin, is any security audit to the source code planned?" In other words, the person asked whether there would be any security testing of the XRB Protocol.

154.    Defendant LeMahieu responded, acknowledging that the Nano Defendants recognized the importance of conducting a security audit to detect any deficiencies or exposure, but admitted that the Nano Defendants had failed to do so. He replied, "We don't have one contracted **though both internally and externally this is an important thing people want completed**."



155.     In August 2018, when users on the Internet forum, Reddit.com, raised concern over the fact that the Nano Developer's Wallet had sold over $600,000 of XRB, Defendant Retzer assured the public that the funds were sold to pay for regular expenses, including salaries.  However, Defendant Retzer also added: "With the current state of the market, it makes sense for the Nano foundation to hold cash to protect the dev fund in case of the price dropping in order to ensure that development continues into the future."

156.     The following month, in September 2018, when Reddit users again asked the Nano Core Team about the large positions sold by the Nano Core Team, Defendant Retzer again acknowledged the highly-speculative nature of XRB's future: "I said a few weeks ago, when the FUD [fear, uncertainty, doubt] was that we were cashing some of the dev funds, that we were simply hedging against a further market crash (It seems a bit backwards that there was FUD that we were selling and now FUD that we are quitting because no money, but alas..)."

157.     In addition, on April 9, 2018, the Nano Defendants announced that they were "sponsoring" a "legal fund" purportedly designed to "provide all victims of the hack of the cryptocurrency exchange BitGrail with equal access to representation" and enable such investors to seek recourse against the exchange.

## XI. Nano's Recommendations Fail to Disclose the XRB Protocol's and the BitGrail Exchange's Lack of Safeguards Protecting the Class' Deposits

158.     Notwithstanding the Nano Defendants' widespread promotion of BitGrail as a safe haven for XRB investors, BitGrail's troubled past, uncertain present, and questionable future make the Nano Defendants' recommendations highly suspect, if not outright reckless.

### A.     The Trading Platform Problem

159.     In late-2017, many BitGrail users reportedly experienced problems with the Nano Protocol and reliability and security of BitGrail's trading platform.

160.     For some users, account balances would inexplicably (and inaccurately) slip into negative figures.

161.     For some users, single account withdrawals were processed twice.

162.     BitGrail accountholders took to social media to decry the lack of reliability and trustworthiness of BitGrail's operations or the reliability of the XRB Protocol itself.

163.     Despite the account glitches and functionality concerns that affected so many BitGrail users, the Nano Defendants did not distance themselves from the BitGrail Defendants as a direct result of the problems.  Rather, according to Defendant Firano, the Nano Defendants "forced" him to keep XRB on BitGrail despite his warnings.

**B.     The Verification Problem**

164.     In or about mid-January 2017, BitGrail proved itself unable to timely verify its new users, which left those users incapable of engaging in anything more than a very meager volume of transactions -- a frustrating circumstance that rendered the users' accounts effectively useless with regard to the purpose for which the accounts were opened.

165.     The Nano Defendants and BitGrail had a public spat over BitGrail's verification problem, and some asserted that the problem stemmed from the Nano Defendants' failure to cooperate with BitGrail's business model.

166.     Despite the verification issue that plagued so many BitGrail users, the Nano Defendants did not distance themselves from BitGrail as a direct result of the problem.

**C.     The $170 Million Disappearing XRB Problem**

167.     In early-February 2018, BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange due to "unauthorized transactions."  The "missing" XRB amounted to approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts and amounts to nearly fifteen percent (15%) of all XRB in existence.

168.     In the aftermath of the purported XRB theft that devastated BitGrail's inventory of the cryptocurrency, the Nano Defendants and the Bitgrail Defendants engaged in yet another very public dispute over the cause of the problem and how it should be resolved.

169.     The Nano Defendants accused Defendant Firano of trying to cover-up the event and of asking NANO to engage in purportedly unethical behavior to solve the problem.  According to the

Nano Defendants, the problem stemmed from flaws related to BitGrail's software, not any issue in the XRB protocol.

170. BitGrail denied all allegations of wrongdoing and alleged that the Nano Defendants were unwilling to cooperate in formulating a solution.

171. In the wake of the latest of the calamities in the relationship between BitGrail and the Nano Defendants, BitGrail users have sought to move their XRB off of the BitGrail exchange into private cryptocurrency wallets; however, BitGrail has made such withdrawals impossible by suspending all account activity.

172. The XRB holders at BitGrail -- including Plaintiffs and the Class -- were ushered there by the Nano Defendants, those users relied on Defendants' representations in investing their assets at BitGrail, and those users have now been burned by the Nano Defendants and the BitGrail Defendants.

**D.** **Lack of Idempotence in the Nano Protocol Resulted in the Theft of the Class' XRB Worth $170 Million**

173. Numerous additional facts have been revealed by Tribunal of Florence in Italy through its issuance of the BitGrail Decision and the Firano Decision. In reaching its decisions, the Tribunal relied upon a court-appointed expert witness to conduct an analysis of the events surrounding the "hack" of the Class' funds on BitGrail. These Decisions included the following findings:

- *During the expert operations it was undisputedly ascertained and shared between the parties that the shortfall took place during the exchange's normal operation and life cycle and by regular users through their own e-mail, data, and wallet, and no stolen key, no crack of the systems, no piercing of the perimeter security program, no trojan/backdoor and no vulnerability of the mathematical protocol of the cryptocurrencies.*

- *[T]the court-appointed expert ascertained that the shortfall 'was caused by multiple withdrawals (also called "double withdrawals") that occurred in circumstances which are not clearly proven. According to the statement of Mr Firano, indeed, these withdrawals occurred on occasions of the malfunctioning of the node (he makes reference to possible 'crashes' of the node), however, today we have no certainty regarding the dynamics of such malfunctions.*

- *The users would, essentially, request withdrawal of a certain amount and receive the same amount twice or more times. This is because, due to the configuration of the exchange system and the features of the*

*cryptocurrency, the Nano node carried out 'double' transactions, i.e., multiple withdrawals, without the exchange having tracked the execution.*

- *Firano became aware of the significant shortfalls – such as the one that occurred in July 2017. . . [t]his emerges clearly from the messages on the Telegram chat with the Nano's development team (that Mr. Firano had joined in December 2016 and left in December 2017) . . ..*

- *Firano had discovered the shortfall in mid-July 2017, when considerable amounts were withdrawn twice (double withdrawals") , so much so that he described the problem in a Telegram group chat attached to the Nano investigative report produced by the public prosecutor and on record as an annex to the court-appointed expert witness report.*

- *From several documents, it emerges how the use of the node as 'accounting centre' was envisages – as, in general, it is also the case for other cryptocurrencies – only for single users, with their private wallet, and without intense or concurrent activity. The exchanges have always been invited to autonomously manage the transactions, precisely because blindly trusting the node implies a high risk, not only for possible double withdrawals.' This is a risk that, in this Court's view should have been managed by the platform operator, which could and should have limited such risk while providing its services.*

- *[T]he analysis of the transactions with the same TXID that were present in a massive way in July 2017 in the 'withdrawals' table indicates how the double withdrawals were almost always related to multiple withdrawal attempts very close together and for the same amount, as also noted by Firano already in July 2017, as well as reported in the Telegram chat with the Nano development team within which Firano had entered in December 2016 and exited in December 2017.*

- *The shortfalls took place because the users who stole the Nano had realized that, by requesting a withdrawal at specific times, it was likely that two identical withdrawals would be granted: one was recorded and considered 'official', while the other was not recorded by the exchange despite being regularly recorded in the blockchain of the Nano node: as a result, several amounts of Nano cryptocurrency left the account without these transactions ever being recorded in the exchange's database.*

174. As demonstrated in the BitGrail Decision and the Firano Decision, the Class' funds were stolen through an exploitation of the Nano Protocol's lack of idempotence by way of Double Withdrawal Transactions. Furthermore, each of the Defendants became aware of this issue in July 2017 when Defendant Firano raised the issue to the Nano Defendants in a private group chat.

41

175. The foregoing events plainly demonstrate that the Nano Defendants: (i) failed to adopt adequate safeguards in the Nano Protocol resulting in the theft of the Class' XRB funds on the BitGrail Exchange; (ii) concealed their actual knowledge that the Double Withdrawal Transactions were resulting in the loss of the Class' funds beginning in July 2017; and (iii) knowingly, or negligently, misrepresented that the Class' funds were "safe" on the BitGrail Exchange with their unqualified recommendations of, and public representations of trust of, BitGrail as the place where XRB should be kept and traded.

### E. Defendants Breached Their Duties Owed the Class and Concealed the Theft of the Class' XRB Investments for Eight Months

176. The Nano Defendants breached their legal duties of care relating to their management of XRB when they failed to, *inter alia*, (i) implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions; (ii) disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks; (iii) permit Defendant Firano to shut down the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018; (iv) disclose to Plaintiff and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018; (v) take reasonable measures to ensure that the exchanges upon which XRB was bought, sold, and traded employed, utilized, and followed adequate security measures and protocols; (vi) know or confirm that the material representations and statements regarding BitGrail's safety and security were accurate; and (vii) Conduct a security audit of the XRB Protocol.

177. Additionally, despite being fully aware of the Double Withdrawal Transactions as of July 2017, the Nano Defendants issued countless statements falsely or negligently assuring Plaintiffs and the Class that their funds were safe on the BitGrail Exchange.

178. For example:





179. Similarly:



180.    The Nano Defendants publicly promoted BitGrail as a safe and reliable place for XRB holders to stake and exchange their XRB, and XRB holders relied on that endorsement by the Nano Defendants in choosing the exchange that would house their valuable assets.

181.    For example, when one concerned XRB holder questioned the Nano Defendants about the sagacity of relying upon the otherwise unknown BitGrail exchange and its seemingly-unreliable founder and principal operator Firano, Defendant Shapiro publicly represented on Twitter that he speaks with Firano every day and that both Firano and BitGrail can be trusted:



182.    As another example, a mere four days before the loss of $170 million worth of the Class's XRB was announced, the Nano Defendants represented that all of BitGrail's issues were "100% on our radar":



183.     Based on Defendants' assurances, assistance, promotion, and instruction, BitGrail became the predominate and nearly exclusive home for XRB.  XRB/BTC[7] was the most popular trading pair at BitGrail and constituted more than eighty percent (80%) of BitGrail's overall trading volume. Moreover, Plaintiff's and the Class's detrimental reliance on Defendants' misstatements, misrepresentations, and omissions of material fact, includes but is not limited to, causing Plaintiff to purchase, acquire, own, hold, and refrain from selling their respective XRB before suffering their respective losses on February 8, 2018.

184.     However, in early-February 2018, when BitGrail announced that it had "lost" $170 Million worth of XRB from its exchange -- approximately eighty percent (80%) of the XRB that BitGrail customers held in their accounts – the Nano Defendants suddenly sought to put immense distance between themselves and the BitGrail Defendants.  So much so that Defendant Firano described Nano, his relationship with the Company and their subsequent falling out as follows:

> *As we continued to work with the NANO team consistently, the majority of the time I highly recommended to them that we close the markets because of major issues with the NANO protocol, but they were hesitant and forced me to keep it open and sometimes begged as well.*
>
> *To mention again, the NANO team, especially Colin LeMahieu had complete access to our servers for a while as we gave him direct access to the database and servers.  That is how close we worked as a team and as a preferred exchange which they forced me to keep open, despite my constant warnings about the technology and problems we were having for months.*
>
> *** *
>
> *The Nano team was relentless in directing users to the BitGrail exchange despite the major issues I had consistently warned them about. . . .*
>
> *** *
>
> *They used me and BitGrail to gain entry into the virtual cryptocurrency market.*

---

[7] "XRB/BTC" represents the exchange of XRB for bitcoin (BTC), the most widely-used and recognizable alternative currency in the world.  In other words, participants on the exchange traded bitcoin for XRB (and vice versa).

185.     Simply stated, the Nano Defendants created the XRB currency, created the BitGrail Exchange with Defendant Firano, directed XRB investors to place their assets at BitGrail (an exchange that they essentially controlled); caused the loss of the Class' XRB by failing to include idempotence in the Nano Protocol; concealed the fact that the Class' funds were, in fact, not "safe" on the BitGrail Exchange, and when nearly all of the XRB "disappeared", the Nano Defendants disavowed any responsibility for the harm the XRB investors suffered.

186.     At all times relevant hereto, Lemahieu, Busch, Shapiro, and Retzer each took to social media outlets -- including Twitter, Facebook, Medium, and Reddit -- to promote XRB and BitGrail as a purported safe haven at which investors could stake and trade their XRB for profit.

187.     Unfortunately, in their fervent push to drive XRB investors to BitGrail, the Nano Defendants failed in their due diligence or knowingly disregarded many material concerns about the Nano Protocol and BitGrail's operations, safety, and reliability.

**COUNT I**
**Negligence**
**Against Nano Defendants**

188.     Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 187 above, and further allege:

189.     The Defendants had a legal duty to exercise reasonable care with respect to the management of XRB, including but not limited to maintaining the XRB Protocol; listing XRB on a secure exchange; promoting the use of secure exchanges; properly vetting the exchanges on which XRB was bought, sold and traded; making accurate representations and statements to Plaintiffs and the Class about the safety of the Class' XRB on the BitGrail Exchange; dissuading the buying, selling, and trading of XRB on BitGrail after multiple red flags and other issues arose; creating a functional, performing, and non-defective XRB token; and conducting a security audit of the XRB Protocol, among other legal duties or care.

190.     Defendants breached their legal duties of care relating to their management of XRB when they failed to, *inter alia*,

a. Implement idempotence into the XRB Protocol thereby permitting the theft of the Class' XRB by the use of Double Withdrawal Transactions;

b. Disclose material information related to the XRB Protocol and the BitGrail Exchange's operation while discussing information, knowledge, and exercising authority on all things XRB-related at panels, conferences, and online social networks;

c. Permit Defendant Firano to shut down the BitGrail Exchange online despite having actual knowledge, or recklessly disregarding, the ongoing theft of XRB from accountholders on the BitGrail Exchange from July 2017 through January 2018;

d. Disclose to Plaintiffs and the Class the fact that the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

e. Take reasonable measures to ensure that the exchanges upon which XRB was bought, sold, and traded employed, utilized, and followed adequate security measures and protocols;

f. Promote secure exchanges that had adequate security measures and protocols for buying, selling, and trading XRB;

g. Refrain from encouraging buying, selling, and trading XRB on exchanges that lacked adequate security;

h. Know or confirm that the material representations and statements regarding BitGrail's safety and security were accurate;

i. Make material representations and statements to Plaintiffs and the Class about the lack of safety and security measures and protocols utilized by the exchanges on which XRB was bought, sold and traded;

j. Dissuade the further buying, selling, and trading of XRB on BitGrail after multiple red flags and other issues arose; and

k. Conduct a security audit of the XRB Protocol.

191. The Nano Defendants' failure to properly exercise the foregoing legal duties of care to Plaintiff and the Class was the proximate cause of the damages suffered by Plaintiff and the Class.

192. Plaintiffs' and the Class's damages total more than Five Million Dollars ($5,000,000.00).

## COUNT II
### Fraud
### Against Nano Defendants

47

193. Plaintiffs re-allege, and adopts by reference herein, Paragraphs 1 - 187 above, and further allege:

194. The Nano Defendants made multiple misstatements and misrepresentations to Plaintiffs and the Class, and further, concealed or failed to disclose material information to Plaintiffs and the Class that Nano Defendants knew not to be true or did not believe to be true, including, but not limited to the following:

    a.  BitGrail was a safe, legitimate, and responsible exchange that observed and followed sufficient safety and security measures, protocols and safeguards;

    b.  the Nano Protocol was secure and included adequate safeguards;

    c.  Plaintiffs' and the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

    d.  Defendant Firano informed the Nano Defendants of the Double Withdrawal Transactions as early as July 2017 and recommended that the BitGrail Exchange be taken offline;

    e.  Plaintiffs' and the Class' funds were safe because the Nano Defendants were working closely with BitGrail to resolve these issues, and that there was no reason for any concern;

    f.  there was no need or reason to relocate or otherwise transfer XRB or any other store of value (e.g., fiat or other cryptocurrency) from BitGrail to other exchanges or wallets;

    g.  the Nano Defendants' sale of XRB was for standard operating costs and not for profit; and

    h.  the Nano Defendants had only paid themselves reasonable, small salaries and were not taking advantage of their positions to unilaterally pay themselves large and excessive salaries.

195. The Nano Defendants made these misstatements and misrepresentations to Plaintiffs and the Class, and concealed or failed to disclose material information to Plaintiff and the Class with the intent to defraud and/or induce Plaintiffs and the Class to rely on these misstatements, misrepresentations, and concealment and nondisclosure of material information.

196. Plaintiffs and the Class justifiably and detrimentally relied on the Nano Defendants' foregoing false statements and representations, including purchasing, acquiring, and holding their XRB on BitGrail.

197.   Plaintiffs and the Class suffered damages as a result of their reliance on the Nano Defendants' foregoing statements and representations, including losing all of their respective XRB on or about February 8, 2018.

198.   Based on the foregoing, the Nano Defendants are liable to Plaintiffs and the Class for damages in excess of Five Million Dollars ($5,000,000.00).

**COUNT III**
**Negligent Misrepresentation**
**Against Nano Defendants**

199.   Plaintiffs re-allege, and adopts by reference herein, Paragraphs 1 - 187 above, and further allege:

200.   Nano Defendants made multiple misstatements and misrepresentations to Plaintiff and the Class, and further, concealed or failed to disclose material information to Plaintiff and the Class including, but not limited to the following:

    a.   BitGrail was a safe, legitimate, and responsible exchange that observed and followed sufficient safety and security measures, protocols and safeguards;

    b.   the Nano Protocol was secure and included adequate safeguards;

    c.   Plaintiffs' and the Class' XRB was being stolen through use of Double Withdrawal Transactions from July 2017 through January 2018;

    d.   That Defendant Firano informed the Nano Defendants of the Double Transactions as early as July 2017 and recommended that the BitGrail Exchange be taken offline;

    e.   Plaintiffs' and the Class' funds were safe because the Nano Defendants were working closely with BitGrail to resolve these issues, and that there was no reason for any concern;

    f.   there was no need or reason to relocate or otherwise transfer XRB or any other store of value (e.g., fiat or other cryptocurrency) from BitGrail to other exchanges or wallets;

    g.   the Nano Defendants' sale of XRB was for standard operating costs and not for profit; and

    h.   the Nano Defendants had only paid themselves reasonable, small salaries and were not taking advantage of their positions to unilaterally pay themselves large and excessive salaries.

201.    The Nano Defendants made these misstatements and misrepresentations to Plaintiffs and the Class without any reasonable ground for believing the statements to be true.

202.    Furthermore, the Nano Defendants failed to disclose material information without reasonably believing that the material information should have been withheld or not disclosed to Plaintiffs and the Class.

203.    Plaintiffs and the Class justifiably and detrimentally relied on the Nano Defendants' foregoing misstatements and misrepresentations, including purchasing, acquiring, and holding their XRB on BitGrail.

204.    Plaintiffs and the Class suffered damages as a result of their reliance on the Nano Defendants' foregoing misstatements and misrepresentations, including losing all of their respective XRB on or about February 8, 2018.

205.    Based on the foregoing, the Nano Defendants are liable to Plaintiffs and the Class for damages in excess of Five Million Dollars ($5,000,000.00).

**COUNT IV**
**Breach of Contract**
**Against BitGrail Defendants**

206.    Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 205 above, and further alleges:

207.    The BitGrail Defendants had legally binding contracts with Plaintiffs and the Class.

208.    The BitGrail Defendants breached their contracts with Plaintiffs and the Class by failing to safeguard their funds and disabling the ability for accountholders to withdraw their XRB assets from the exchange.

209.    The BitGrail Defendants breaches are the proximate cause of the damages suffered by Plaintiffs and the Class.

210.    Defendants are liable to Plaintiffs and the Class for damages resulting from Defendant BitGrail's breaches of contract in excess of $5 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the proposed Class pray for relief and judgment against Defendants, as follows:

A.      Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class Representatives and their counsel as Class counsel;

B.      A judgment awarding Plaintiffs and the Class equitable restitution, including, without limitation, rescission of their investments in all XRB held in accounts at BitGrail, restoration of the *status quo ante*, return to Plaintiffs and the Class all cryptocurrency or fiat currency they paid as a result of Defendants' unlawful and unfair business practices and conduct;

C.      An award of any and all additional damages recoverable under law -- jointly and severally entered against Defendants -- including but not limited to compensatory damages, punitive damages, incidental damages, and consequential damages;

D.      An Order requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with XRB;

E.      An Order imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class;

F.      Awarding pre-judgment and post-judgment interest;

G.      Awarding Plaintiffs and the Class reasonable attorneys' fees, expenses, and the costs of this action; and

H.      Granting other relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury of all claims so triable.

Dated: August 3, 2020                     Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By: */s/ Rosanne L. Mah*
Rosanne L. Mah
**LEVI & KORSINSKY, LLP**
388 Market Street, Suite 1300
San Francisco, CA 94111

Telephone: (415) 373-1671
Facsimile: (415) 484-1294

Donald J. Enright*
**LEVI & KORSINSKY, LLP**
1101 30th St., NW, Ste. 115
Washington, DC 20007
Telephone: (202) 524-4292
Facsimile: (202) 363-7171

David C. Silver*
Jason S. Miller*
**SILVER MILLER**
11780 W. Sample Road
Coral Springs, FL 33065
Telephone: (954) 516-6000

*Counsel for Plaintiffs*

* to be admitted *pro hac vice*